IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| *Plaintiff,* | § § § | SA-21-CR-00263-OLG |
| vs. | § § § | |
| (1) OSCAR ROMO-MARTINEZ, | § § § | |
| *Defendant.* | § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable Chief United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns Defendant's Motion to Dismiss Because § 1326 Violates Equal Protection Under *Arlington Heights* [#36], which was referred to the undersigned for a report and recommendation on October 13, 2022, pursuant to Western District of Texas Local Rule CV-72 and Appendix C. The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Defendant's motion be **denied**.

**I. Background**

Defendant Oscar Romo-Martinez, a Mexican national, was indicted for unlawful re-entry pursuant to 8 U.S.C. § 1326(a) and (b)(2) on June 2, 2021, after Immigration and Customs Enforcement ("ICE")/Enforcement Removal Operations ("ERO") encountered Romo-Martinez outside of his residence in San Antonio, Texas. (Compl. [#1], at 1; Probable Cause Aff. [#1], at 2; Indictment [#9], at 1–2.) The probable cause affidavit underlying the criminal complaint and indictment alleges that Romo-Martinez was first removed from the United States to Mexico on

1

May 22, 2015, and had not been granted permission to reapply for admission at the time he was detained by ICE/ERO.  (Probable Cause Aff. [#1], at 2.)  Jury selection and trial are currently set for October 31, 2022.  (Amended Scheduling Order [#46].)

Section 1326 criminalizes the reentry into the United States of a previously removed alien.  8 U.S.C. § 1326(a).  Where the alien's prior removal was subsequent to a commission of an aggravated felony, the criminal penalty for unlawful reentry is a fine and/or imprisonment for no more than 20 years.  *Id.* at § 1326(b)(2).  The Government has provided notice of an intent to offer proof that Romo-Martinez's prior deportation alleged in the indictment was subsequent to a conviction of felony assault of a public servant on August 5, 2013, and therefore Romo-Martinez may be sentenced to a term of imprisonment of up to 20 years, a term of supervised release of up to three years, a fine of up to $250,000, and a mandatory special assessment of $100.  (Notice [#12], at 1.)

Romo-Martinez has filed a motion to dismiss the indictment on the basis that Section 1326 is unconstitutional.  Romo-Martinez argues that Section 1326 violates the Fifth Amendment's guarantee of equal protection under the framework set forth by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), because the law was enacted with a discriminatory purpose and continues to have a disparate impact on Mexican nationals and other Latinx immigrants.

Numerous defendants have made this same argument in jurisdictions throughout the country over the past several years.  Among the district courts considering similar motions to dismiss, all but one have declined to dismiss the challenged indictments on equal protection grounds.  *Compare, e.g., United States v. Leonides-Seguria*, No. 21 CR 390, 2022 WL 4273176, at *4 (N.D. Ill. Sept. 12, 2022) (denying motion to dismiss); *United States v. Lopez-Segura*, No.

CR-22-00196-PRW, 2022 WL 4084438, at *4 (W.D. Okla. Sept. 6, 2022) (same); *United States v. Barrera-Vasquez*, No. 2:21CR98, 2022 WL 3006773, at *8 (E.D. Va. July 28, 2022) (same); *United States v. Maldonado-Guzman*, No. 21 CR 448 (CM), 2022 WL 2704036, at *5 (S.D.N.Y. July 12, 2022) (same); *United States v. Guadalupe*, No. 2:18-CR-00240-TLN, 2022 WL 2276705, at *3 (E.D. Cal. June 23, 2022) (same); *United States v. Cortez-Mendoza*, No. 2:20-CR-131-RMP-1, 2022 WL 706917, at *1 (E.D. Wash. Mar. 8, 2022) (same); *United States v. Ferretiz-Hernandez*, No. 5:21-CR-63-JA-PRL, 2022 WL 815339, at *4 (M.D. Fla. Feb. 2, 2022), *report and recommendation adopted*, No. 5:21-CR-63-JA-PRL, 2022 WL 815331 (M.D. Fla. Mar. 17, 2022) (same) *with United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1022 (D. Nev. 2021) (granting motion to dismiss indictment on ground Section 1326 was motivated by racial animus). District courts in the Fifth Circuit have similarly rejected constitutional challenges to Section 1326 under *Arlington Heights* in both initial criminal and postconviction proceedings. *See United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815, 818 (S.D. Tex. 2022); *United States v. Barcenas-Rumualdo*, 3:20-cr-1849-DB (W.D. Tex. May 7, 2021) (dkt. 38); *Ortiz-Beltran v. United States*, No. 7:21-cv-0325 (S.D. Tex. Jan. 5, 2022) (dkt. 9). No circuit court has yet considered an equal protection challenge to Section 1326.

Romo-Martinez requests an evidentiary hearing on the motion. The Government has filed a response in opposition to the motion [#44]. Romo-Martinez did not file a reply. After reviewing the parties' filings and the record before the Court, the undersigned has determined that an evidentiary hearing is not necessary to resolve the factual and legal issues before the Court. The motion is therefore ripe for the Court's review.

## II.  Legal Standard

The Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from "invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). "Criminal defendants, regardless of immigration status, are entitled to due process under the Fifth Amendment." *Hernandez-Lopez*, 583 F. Supp. 3d at 817–18 (citing *United States v. Mendoza-Lopez,* 481 U.S. 828, 837 (1987) ("If [Section 1326] envisions that a court may impose a criminal penalty for reentry after any deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, the statute does not comport with the constitutional requirement of due process.")).  *See also Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.").

Laws that "explicitly distinguish between individuals on racial grounds" fall within the core of the Constitution's equal protection prohibition and are therefore "subject to strict scrutiny." *Lewis v. Ascensions Parish Sch. Bd.*, 806 F.3d 344, 354 (5th Cir. 2015) (quoting *Shaw v. Reno*, 509 U.S. 630, 642 (1993)).  Section 1326 is facially race-neutral and does not expressly distinguish between individuals or even multiple categories of aliens on racial grounds.  To subject this kind of government action to strict scrutiny, "the plaintiff must establish both discriminatory intent and a disproportionate adverse effect upon the targeted group." *Id.* at 358 (citation omitted).  Otherwise, facially neutral government action is subject to rational basis review.  *Lewis*, 806 F.3d at 363.

The parties disagree as to the standard of review governing Romo-Martinez's equal protection challenge. The Government argues the Court should apply rational basis review from the outset of its analysis because laws addressing immigration are typically reviewed under this more deferential standard. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (observing, in context of constitutional challenge to application of Immigration and Nationality Act, that "the power over aliens is of a political character and therefore subject only to narrow judicial review" (internal quotation and citation omitted)); *see also Trump v. Hawaii*, ---U.S.---, 138 S. Ct. 2392, 2418 (2018) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'") (quoting *Fiallo*, 43 U.S. at 792). The Fifth Circuit has emphasized that when immigration laws are challenged on equal protection grounds, a court's "equal protection review is necessarily narrow; for 'over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.'" *Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 503–04 (5th Cir. 2006) (quoting *Fiallo*, 430 U.S. at 792).

"Rational basis review begins with a strong presumption of constitutional validity." *Id.* at 504. Under rational basis review, the law's challenger bears the burden to show that the law, as applied, is arbitrary. *Id.* It is not the Government's burden to establish rationality. *Id.* "Under rational basis review, differential treatment 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Madriz–Alvarado v. Ashcroft*, 383 F.3d 321, 332 (5th Cir. 2004) (quoting *FCC v. Beach Commc'ns*, 508 U.S. 307, 314 (1993)).

Romo-Martinez, on the other hand, asks the Court to apply the heightened *Arlington Heights* framework and subject § 1326 to strict scrutiny. Under the *Arlington Heights*

framework, the party challenging the constitutionality of a given statute bears the burden to show that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (citation omitted). If the challenger satisfies that burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor," as the law may still be valid if "the same decision would have resulted even had the impermissible purpose not been considered." *Id.*; *Arlington Heights*, 429 U.S. at 271. Both the challenger and, if necessary, the defender satisfy their respective burdens by a preponderance of the evidence. *Hunter*, 471 U.S. at 225. Again, "[a]bsent proof of a discriminatory purpose, courts apply rational basis review." *Hernandez-Lopez*, 583 F. Supp. 3d at 818 (citing *Arlington Heights*, 429 U.S. at 265–66).

### III. Analysis

Having considered the arguments of the parties and the record before the Court, the undersigned finds it unnecessary to determine whether strict scrutiny or rational basis review applies to Romo-Martinez's constitutional challenge to Section 1326. Under either standard, Romo-Martinez is unable to satisfy his burden to invalidate his criminal indictment under Section 1326 based on a violation of his right to equal protection. Therefore, his motion to dismiss should be denied.

A.   **Romo-Martinez fails to satisfy his burden under *Arlington Heights*.**

Under *Arlington Heights*, Romo-Martinez bears the burden to establish by a preponderance of the evidence that (1) the enactment of Section 1326 was motivated by a racially discriminatory intent or purpose, and (2) § 1326's enforcement has a racially disproportionate impact on Mexican and other Latinx immigrants. *Arlington Heights*, 429 U.S. at 264–65. "Legislators' awareness of a disparate impact on a protected group is not enough: the

law must be passed *because of* that disparate impact." *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc) (emphasis in original) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  Romo-Martinez fails to satisfy his burden as to discriminatory purpose or disparate impact.

        i.        **Racially Discriminatory Purpose**

Racial discrimination "need only be one purpose, and not even a primary purpose," of the passage of Section 1326 for a violation to occur.  *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (quotation and citation omitted).  In other words, so long as the enactment of Section 1326 was motivated by a racially discriminatory intent or purpose, even if accompanied by other non-discriminatory purposes, the law violates the Equal Protection Clause.

"Legislative motivation or intent is a paradigmatic fact question."  *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)).  The Supreme Court has set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose.  *Veasey*, 830 F.3d at 230 (citing *Arlington Heights*, 429 U.S. at 267–68).  "Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body."  *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68).

In arguing that Section 1326 was enacted with discriminatory intent, Romo-Martinez focuses primarily on the first, second, and fifth factors—the historical background surrounding the enactment of the challenged law, the events leading up to the decision, and the law's legislative history.  In doing so, Romo-Martinez asks the Court to focus almost exclusively on

the history surrounding the enactment of the Undesirable Aliens Act in 1929, a predecessor law to Section 1326, by which Congress first criminalized unlawful entry and unlawful reentry into the United States. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 1 ("[I]f any alien has been arrested and deported . . . and if he enters or attempts to enter the United States . . . , he shall be guilty of a felony . . . ."); *id* at § 2 ("Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials . . . shall be guilty of a misdemeanor.").

Yet, the unlawful reentry provision that is now known as Section 1326 was not codified under Title 8 of the United States Code until the enactment of the Immigration and Nationality Act of 1952, often referred to as the McCarran-Walter Act. *See* Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 275, 66 Stat. 229. Since that time, Section 1326 has been amended five times—in 1988, 1990, 1994, and twice in 1996—to increase the penalties for unlawful reentry. *Hernandez-Lopez*, 583 F. Supp. 3d at 819. The specific provision under which Romo-Martinez was indicted is Section 1326(b)(2), which imposes enhanced penalties for those with prior felony convictions and was part of the amendments in the Anti-Drug Abuse Act of 1988. *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988) (codified at 8 U.S.C. § 1326 (1988)). "Congress enacted and later amended § 1326(b) to increase the maximum illegal-reentry sentences for noncitizens whose previous removal occurred after they were convicted of a felony." *United States v. Osorto*, 995 F.3d 801, 814 (11th Cir. 2021).

The evidentiary record before the Court also focuses primarily on the 1929 law and includes a declaration by historian Dr. Kelly Lytle Hernandez, the transcript of the testimony of Dr. Hernandez and political science professor Benjamin Gonzalez O'Brien from an evidentiary hearing in *Carrillo-Lopez* (the one case in which the district dismissed the challenged indictment

under *Arlington Heights*), excerpts from the legislative history for the Undesirable Aliens Act of 1929, President Truman's letter to Congress explaining his veto of the 1952 bill (which Congress had sufficient votes to override), and the statement of Deputy Attorney General Peyton Ford on the 1952 bill.  This record is similar to the evidentiary record provided to other courts considering equal protection challenges to Section 1326.  *See, e.g.*, *Hernandez-Lopez*, 583 F. Supp. 3d at 819; *Carrillo-Lopez*, 555 F. Supp. 3d at 1000–01 & n.2.

This evidence substantiates Romo-Martinez's position that the original unlawful entry law of 1929 was enacted at a time when nativism and Arianism in the United States were at a "high pitch," fueled by fears of "non-white" immigration and the "contamination" of Anglo-American society.  (Hernandez Testimony [#36-3], at 23–27.)  Historians now refer to the 1920s as "the Tribal Twenties," due to the particular fervor of nativist sentiments at this time. (Hernandez Decl. [#36-1], at 2.)  During this time period, politicians and public intellectuals embraced and preached the dangerous "science" of eugenics and advocated for the closing of the borders of the United States to all immigrants except those from Western Europe.  (*Id.* at 2.)  The popularization of these racist theories led to the 1924 National Origins Act, which imposed quotas based on country of origin (in which 96 percent of quota slots were reserved for European immigrants), as well as literacy requirements and an $18 head tax at official points of entry to the United States.  (*Id.* at 2–3.)

Noticeably absent from the quota system of 1924, however, were all countries from the Western Hemisphere, due to lobbying by employers from all across the southwestern United States who depended upon unrestricted access to a labor force from across the Southern border with Mexico.  (*Id.* at 3.)  Against this backdrop, Dr. Hernandez contextualizes the enactment of the 1929 unlawful entry law as a compromise between nativists who embraced a eugenical

approach to immigration (and who feared the influx of the "Mexican peon") and the "rising empire" of agribusiness in the Southwest.  (*Id.* at 4; Hernandez Testimony [#36-3], at 33.)  According to Hernandez, the idea behind the compromise was that an unlawful entry law would shift the focus to controlling unauthorized Mexican migration through unmonitored border crossings rather than capping authorized migration, which, practically speaking, would allow western businessmen to take advantage of the Mexican labor force temporarily but ensure those same workers did not settle permanently in the United States, as they would be subject to both deportation and criminal prosecution.  (Hernandez Decl. [#36-1], at 7.)

Romo-Martinez has provided the Court with excerpts from the Congressional Record of the passage of the 1929 law, in which certain members of Congress unabashedly advocated for adding Mexico to the quota system in an attempt to exclude the "illiterate, unclean, peonized masses moving this way from Mexico" and to protect "American racial stock from further degradation or change through mongrelization."  (House Cong. Rec. [#36-4], at 1; *see also* Senate Cong. Rec. [#36-5], at 2 (faulting Mexican immigrants with the "general weakening, physically and mentally, of our civilization").)  In 1928, the House Committee on Immigration and Naturalization entertained testimony from renowned eugenicist, Dr. Harry H. Lauglin, who similarly testified on the potential to use immigration as a tool for advancing eugenics.  (Laughlin Testimony [#36-6], at 1–89.)

The darkness of this history is undeniable.  And, as other courts have recognized, it is certainly relevant in understanding the historical backdrop against which the original 1929 unlawful reentry provisions were made law.  *See Hernandez-Lopez*, 583 F. Supp. 3d at 820.  Were the Court's task to look solely at the 1929 law, Romo-Martinez would likely have satisfied his burden under *Arlington Heights*.  However, this history is not dispositive of the question of

whether the laws underlying Romo-Martinez's indictment, enacted in 1952 and 1988, were enacted with a similar discriminatory purpose.

Romo-Martinez's evidence as to the codification of Section 1326 in 1952 is more limited, as to the 1988 amendments, even more so. The testimony of political science professor, Dr. O'Brien, explains that there simply was not much debate around Section 1326 leading up to the 1952 passage of the McCarran-Walter Act. (O'Brien [#36-3], at 99.) The professor indicates that the only references to Mexican immigration in the Congressional record at that time is reflected in the emergence of the derogatory term "wetback" to describe immigrants who utilized unmarked crossings on the Southern border, such as the Rio Grande River, to enter the United States. (*Id.*) In fact, just months prior to the passage of McCarran-Walter, there was an attempt to pass a "Wetback Bill" in Congress. (*Id.* at 113.) Nonetheless, Romo-Martinez asks us to assume that the same historical context that drove the 1929 enactment drove the decision to recodify the unlawful reentry provision as part of the Immigration and Nationality Act. (*See id.* at 130–31.)

This argument goes too far, particularly given the reality that Romo-Martinez was also indicted under the 1988 penalty provision targeting aliens whose prior removal was subsequent to a commission of an aggravated felony. 8 U.S.C. § 1326(b)(2). This provision was not a part of the original 1929 law. "Even with a history of racial animus towards people from Mexico and Central America, [Romo-Martinez] must show that the provision he was charged with violating was itself enacted at least in part by racial animus." *Hernandez-Lopez*, 583 F. Supp. 3d at 823. "He cannot merely point to the general history of racial animus in immigration policy and the absence of a refutation of this history to meet his burden." *Id.* Romo-Martinez fails to cite any

legislative history that shows racial animus in the enactment of Section 1326(a) in 1952 or Section 1326(b)(1) in 1988. *Id.*

Romo-Martinez argues, citing *Ramos v. Louisiana*, ---U.S.---, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Department of Revenue*, ---U.S.---, 140 S. Ct. 2246 (2020), that the Supreme Court has recently made clear that subsequent enactments of a statute cannot "cleanse the law of its original taint." Yet, as numerous district courts addressing the issue in this case have pointed out, neither of these Supreme Court decisions involved an equal protection challenge. *Hernandez-Lopez*, 583 F. Supp. Ed at 823 (collecting cases). And neither of these cases held that discriminatory motivations of prior legislatures "are determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature." *United States v. Rios-Montana*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *4 (S.D. Cal. Dec. 8, 2020).

The Fifth Circuit has emphasized, in the specific context of an *Arlington Heights* equal protection challenge, that this Court may not presume, without proof, that "any invidious intent" behind a prior statute is "necessarily carried over to and fatally infected" its subsequent iteration. *Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018). Despite the emergence of the derogatory term "wetback" in the 1950s and the undeniable persistence of racism during this time period among some legislators, the 1952 Immigration and Nationality Act itself was an overhaul of prior piecemeal and overtly discriminatory immigration laws that aimed to address some of the inequities previously characterizing the laws. *See United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567, at *7–8 (D.V.I. June 16, 2021). The new law, while still problematic in many respects, removed some of the racial distinctions of prior immigration law, such as the ban on allowing those of Asian descent to become American citizens. (O'Brien Testimony [#36-3], at 115–16.) The 1952 legislature's silence on the purpose of codifying unlawful reentry as part

12

of the Immigration and National Act does not necessarily speak to its endorsement of the nativist sentiments underlying the enactment of the 1929 Act.

Romo-Martinez bears the burden to establish by the preponderance of the evidence that the statutes under which he was indicted were enacted with discriminatory intent. He has not carried this burden. The evidentiary record before the Court does not provide the Court with sufficient evidence from which to conclude that a motivation of the 1952 and 1988 legislatures, in enacting Section 1326(a) and Section 1326(b)(2), was racial discrimination.

### ii.     Racially Disparate Impact

Nor has Romo-Martinez carried his burden to demonstrate the discriminatory purpose behind Section 1326 based on the disparate impact on Mexican and other Latinx immigrants. *See Arlington Heights*, 429 U.S. at 266 (acknowledging the "rare case" in which the impact of an official action is sufficient to find a constitutional violation). Romo-Martinez argues that the statistics regarding Section 1326 prosecution evidence this disparate impact, because the executive branch has historically wielded the law as a tool of mass prosecution of Mexican and Latinx defendants. According to studies cited by Romo-Martinez in his motion, Mexicans have historically comprised between 84.6 and 99 percent of all immigration offenders. (Hernandez Decl. [#36-1], at 8.) These statistics may demonstrate the disparate impact of Section 1326 prosecutions on those from Mexico and Central America, but they do not adequately express the reason for that disparate impact. The Government argues that the race-neutral reality of Mexico's proximity to the United States and the economic factors leading to large-scale immigration across the Southern border provide an explanation for the disparity and undermine Romo-Martinez's assertion that the disparity is due to the discriminatory purpose behind the law.

The undersigned agrees that these statistics do not, without more, establish the disparate impact on Mexican and other Latinx individuals due to racial discrimination.

**B.      Romo-Martinez fails to satisfy his burden under rational basis review.**

Under rational basis review, Romo-Martinez bears the burden to establish that Section 1326, as applied, is arbitrary. *Malagon de Fuentes*, 462 F.3d at 504. Romo-Martinez did not file a reply in response to the Government's argument that rational basis review governs the Court's constitutional inquiry. And his motion does not advance any persuasive argument that Section 1326, as applied, is arbitrary.

Again, Section 1326 does not prescribe differential treatment among various groups of aliens based on race. It applies equally to all undocumented immigrants found unlawfully in the United States regardless of race, nationality, or country of origin. The only arguable distinction made by the statute is that the statute criminalizes the unlawful entry into the United States as to aliens subject to a prior removal, deportation, exclusion or denial of admission, but does not impose the same punishment on those experiencing their first encounter with immigration authorities. This distinction is not arbitrary or irrational. The Government has a legitimate interest in regulating its borders, enforcing prior removal orders, and deterring the repeated violation of immigration laws. Section 1326 is rationally related to this interest. As other district courts have pointed out, this purpose was articulated at the congressional debate surrounding the 1990 reenactment of Section 1326. *See* 136 Cong. Rec. 36844 (Oct. 27, 1990) (explaining that amendments to immigration legislation would "not disturb the basic reasons for which we have always, and will always, exclude aliens:" including, "For cases where aliens . . . have previously violated U.S. immigration laws").

The Fifth Circuit has upheld laws pertaining to immigration under rational basis review that make other such distinctions, such as the distinction between lawful permanent residents who have committed certain offenses (crimes involving moral turpitude and controlled substances) and subsequently chose to leave the country versus those who have committed the same offense but have not left the country and therefore are not attempting reentry. *See Malagon de Fuentes*, 462 F.3d at 503–04 (explaining that such offenses may not subject a lawful resident to deportation but having left the country briefly renders the resident inadmissible as to reentry). The Fifth Circuit reasoned that Congress's "choice to disfavor the admission of aliens who have committed offenses is not irrational"; "[n]or is its decision to make getting into the United States more difficult than remaining." *Id.* at 504. Like the immigration-related criminal statute challenged in *Malagon de Fuentes*, Section 1326 does not distinguish between categories of aliens based on race, is supported by a rational basis, and is therefore constitutional.

### IV.  Conclusion and Recommendation

Having considered Romo-Martinez's motion, the Government's response, the evidentiary record before the Court, and the governing law, the undersigned recommends that Romo-Martinez's Motion to Dismiss Because Section 1326 Violates Equal Protection Under *Arlington Heights* [#36] be **DENIED**.

### V.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is

modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Objections are limited to no more than 20 pages unless leave of court is granted. The party shall file the objections with the Clerk of Court and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

    SIGNED this 8th day of November, 2022.

_____
ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE